Case number 17-5247. Oceana, Inc. Appellant v. Wilbur Ross and his official capacity as Secretary of the United States Department of Commerce et al. Mr. Paterno for the Appellants, Ms. Kupfer for the Appellants. Mr. Paterno. Mr. Paterno. Mr. Paterno. May it please the Court, my name is Lyle Paterno and I represent Appellant Oceana. Oceana raises four issues in this appeal, but with the Court's permission, I'd like to focus on the first during the few minutes I have this morning. This is a fairly narrow and straightforward issue in light of what this Court has already decided. In 2011, when considering a challenge to a prior version of this same rule, this Court made clear that, as a matter of law, an agency violates a statutory command to establish a methodology when the rule permits the agency to, quote, free itself at will from the methodology it purportedly established. That was the problem with the prior rule, which allowed the agency to depart from its prescribed methodology for allocating bycatch observers whenever the agency faced a funding constraint. You've truncated the second half of the whole thing, which is and fails to commit itself to any intelligible standard once the exception is triggered. That's right, Your Honor. In 2011, this Court discussed the cement kiln case, and as you mentioned, there were two prongs to that test. The first is that the agency must identify the circumstances, adequately identify the circumstances. And they clearly fixed the second problem. Yes, Your Honor. So they have one set of rules that applies in the world where they have full funding, and then they have essentially, as I understand it, an algorithm for paring down the inspection program to the extent they're strapped for resources and operating under the Anti-Deficiency Act, which would make it a criminal offense to spend more money than they have. Well, you're right, Your Honor. Oceana does not challenge the second prong of the two-pronged cement kiln test. We're focusing on the first. And you're absolutely right that the agency has put in place this algorithm to depart from the methodology it establishes whenever funding is insufficient. But we submit that there are really three problems with that. The first, as you mentioned, Your Honor, that this departure is triggered whenever funding is insufficient. The problem is that, as this Court noted in 2011, other provisions of the same Fisheries Act specifically direct the agency to carry out the provision to the extent practical here that that qualifier is conspicuously absent. And as this Court stated in 2011 at 1243 of the Oceana IV opinion, when a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear. But doesn't the rule also command the agency to expend resources basically at the same level that it's historically done so? No, Your Honor. Actually, it doesn't. It provides there that that's a guide, that historical spending is a guide, but that's not a requirement. And, in fact, the rule actually notes that historically funding has been inadequate, and going forward it notes that funding levels are likely to vary. It's important to note that these four internal funding lines that the agency has identified are totally internal. These are buckets, for lack of other words, buckets in the agency's own budget. So the agency has total control over how much funding goes into these four funding lines, how much funding from these four funding lines. Well, do you think that the statute requires the agency to prioritize this over whatever the other priorities are that the agency has? I mean, no agency has enough money to do everything that they would like to do. That's right, Your Honor. And this Court in 2011 said that. The only constant is that agencies never have enough money to do as much as they'd like. But with that said, the Court in 2011 did say that here there is no qualifier to carry out this methodology to the extent, or excuse me, to establish this methodology to the extent practical. And so also to put this in context, the total cost in 2015 when this rule was promulgated to fully implement the methodology is about $16 to $17 million. That's about 2 percent of the agency's overall appropriation for that year. So we're not talking about a ton of money. The agency has tried to make this case about funding. But it's really only about funding because the agency has elected that we submit against what this Court said in 2011, has elected to put this funding trigger in place. There could be a funding trigger, Your Honor, if the agency did not have discretion over the funding itself. But this Court in that prior decision made clear that when the agency controls both the amount of funds required for the methodology and the level of funding that's available, the agency simply reserves to itself too much discretion. How specific are the relevant appropriations? Is there one targeted to all inspections under this statute and the agency discretion is just to allocate among regions? Or is it broader than that, narrower than that? My understanding, Your Honor, is that it's fairly broad. I think there's some appropriation. The agency submits a justification to Congress when it seeks the appropriation, and it has an amount for, you know, the fisheries service as part of NOAA. But then within that, the agency, and I'm sure my colleague can correct me if I'm wrong, but the agency then decides how much funds to allocate to bycatch, and then within that, how much of these four funding lines to allocate to this specific action. So when you talk about four funding lines, your understanding is that's purely a construct of agency discretion rather than congressionally imposed limits on the relevant appropriations? Absolutely, Your Honor. But isn't that determined by the methodology the agency put in place? Well, Your Honor, certainly the agency has taken the position that this is part of the methodology. Right, that's their argument. Their argument is that once they've – I think their argument is that the only discretion they've left for themselves is distributing the congressional appropriation among all of their funding lines. But the methodology that they've put in place in response to our earlier decision controls which of the funding lines get money for bycatch evaluation and what happens if there's a shortfall. Is that not accurate? I don't think that's accurate, Your Honor. I think the agency reserves complete discretion for how much funding goes into these four funding lines and how much comes out. But the methodology – they could always change them, but the methodology they put in place controls that, doesn't it? Doesn't that determine which of the four funding lines get the money? No, Your Honor. Is that not true? I think that's not true. I think the methodology simply says we identify these four internal funding lines and whenever funds in these four internal funding lines are insufficient, then we trigger this process. And as Judge Katza says, then we're in the cement kiln second prong, which says they have to have an identifiable standard to depart from the methodology. Oceana does not challenge that. We think that the agency does have a certain standard to follow when they're departing. But they still impermissibly reserve discretion on the front end to decide at their liberty when they want to depart from the methodology. And to be clear, it is a departure. The methodology they've established is this 30% coefficient of variation. And the whole reason they have this is because the agency has said that if the CV goes higher than 30%, then the data is simply unreliable. It's not usable. And the whole purpose of the Fisheries Act, of this provision of the Fisheries Act, is to yield reliable information so as to set catch limits and prevent over-catching in subsequent years. So this really, it matters, and it is a departure from the methodology when the agency decides that this 30% CV they've established, as the methodology no longer applies to species at the agency's will. But that's for, but you're talking about the non-federally protected species, right? The federally protected species, are you saying that the methodology also allows the CV to exceed 30% for those? Yes, Your Honor. To be clear, on our second issue, certainly Oceana challenges the fact that the agency does not even apply the methodology to non-federally managed species, and that is a concern that Oceana has. But that's a separate issue.  And even for the federally managed species that the agency purportedly applies this methodology to, the agency departs from that 30% CV whenever the agency decides to allocate insufficient funds to these internal, these four internal funding lines. There's nothing in this statute tells the agency how to allocate priorities as between this program and all the other programs they have to administer, right? And indeed, there's a background rule that unless there's a specific instruction from Congress, agencies not only have discretion to make those judgments, but perhaps unreviewable discretion. So why shouldn't we just take that as a given? And the agency has eliminated all other questions, and the only element of discretion left in this system is their choice among competing priorities. And, you know, it sounds bad in this case if you imagine the hypothetical where they're directing money elsewhere, but they're directing money towards the program that your client is interested in. Somebody else will be here complaining that funds aren't being spent on their program. Well, so you're right, Your Honor, that the statute does not specifically prioritize funding allocations. But really, Oceana is not asking this court to do anything that the court didn't already decide in 2011, which is that when the qualifier, to the extent practicable, or some sort of prioritization provision or something like that, when that's lacking from a specific statutory command, then the agency is required to follow that command. And to be clear, the agency has tried to make this about funding, but there are many other ways the agency could establish that methodology. For example, Oceana and other commenters urge the agency to consider other sources of funding, such as industry funding. There are certain fisheries, like the scallops fishery, where industry funding is used to supplement. How can a court like this second-guess those kinds of decisions? What's the basis for doing that? Your Honor, we're certainly not asking the court to second-guess the agency's funding discretion, how it's using those funds. All that Oceana is asking is that when Congress directs an agency to establish a certain methodology, the agency, as this court held in 2011, must establish it. So get specific for me, if you would. Sure. Looking at the current methodology and comparing it to the last one, is it with respect to the allocation of funds to the four funding lines that you think there needs to be less discretion? And so what needs to happen there? What specifically do you want the agency to do to satisfy our earlier decision? So the earlier decision, the agency said that it could depart from the methodology whenever there was a, quote, external operation constraint. We certainly can see there are more words here. The agency has given a more detailed explanation of what this operational inconvenience is. Are you not satisfied with what the methodology does for situations where there's a funding shortfall? Well, again, Your Honor, we don't have a problem with the second prong of cement kiln, and that prong says that when the agency does depart, it has to follow an identifiable standard. We don't have a problem with that here, and that is a difference from the earlier 2011 decision. They've solved that problem. They've solved that problem. But they have not solved the problem, the antecedent problem, of the fact that they still have complete discretion, Your Honor, over when to trigger the departure. They decide how much funds go into these four funding lines. They decide of those funds how much to allocate to this region. They decide how much to pull out for administrative or overhead costs, whether to disregard other sources of funding, such as industry funding. And also, to be clear, Oceana and others urged the agency to take steps that we thought were more cost effective, such as supplementing onboard observers with electronic monitoring, and the agency completely disregarded that. They didn't even consider it. The agency said that because it was rejected in the 2008 rule, the agency didn't even need to consider it again. Didn't they say in response to the comments that I thought they had responded and said that these electronic technologies just weren't sufficiently precise yet? Well, you're right, Your Honor, but in saying that, the agency relied completely on pre-2008 data. So the agency did not consider any information that postdated the prior rule. Now, the agency did cite two of the studies. Did commenters submit more recent data? Yes, Your Honor. Well, so to be clear, the agency at the very beginning of this process said that we're deeming every issue, apart from the prioritization process issue that we've been discussing, we're deeming all of those to be considered and rejected. Oceana and others urged the agency to consider electronic monitoring, in part because Oceana submits that it could be more cost effective than only using observer. But did you submit data showing that it was now far more precise than it was the last time around? Excuse me, Your Honor? Did you submit data in support of that, that electronic monitoring was now far more precise than it was at the earlier regulatory? Well, Oceana, as well as the Environmental Defense Fund and the Nature Conservancy, did point to at least two sets of data regarding electronic monitoring. One is at JA370 to 371, and that's related to the implementation of electronic monitoring in the Atlantic highly migratory species fishery. And the second was, excuse me, the second is JA351 to 353. That's a letter from the Environmental Defense Fund discussing a three-year study. So these commenters did urge the agency to consider this data, and the agency, as you said, kind of put the cart before the horse and said, well, because we've already concluded that electronic monitoring is both technological and not cost effective, we're not even going to consider these studies that you're urging us to consider? Well, I thought the record was updated, right? The commenters did, in fact, submit updated evidence, right? Yes, Your Honor. And the agency explanation, which is the technology, didn't they say in 2015, we continue to adhere to our view that the technology isn't sufficiently good for these fine judgments about what kind of species we're talking about and is costly? You're right, Your Honor. So that seems like it's a perfectly good explanation for APA purposes, and then the question is simply whether there's substantial evidence in the record to support that judgment. Well, you're right, Your Honor. I think it would be a sufficient explanation if the agency had, in fact, consulted the correct data and had looked at timely data under the District Hospital Partners case and under the City of New Orleans case. The agency has a requirement under the APA to consider timely data, to continue to analyze the studies that it has relied on, and we submit it hasn't done so. Moreover, there's an additional stronger standard here that the District Court called it a stronger standard under the Fisheries Act, which requires the agency to base its plan on the best scientific information available. So even if under APA standards the agency gave a sufficient explanation, we submit that the explanation is inconsistent with the requirement to consider the best scientific information available, when here the agency said both at the very beginning of the process and in the final rule, we deem all policy alternatives to be considered and rejected. The agency was blatant about the fact that it did not even consider any data post-2008. It did cite those two studies that Judge Tatel and I were discussing, but it in no way analyzed them, it in no way discussed the data, it simply cited them as studies that commenters had raised and simply said because we've already decided that electronic monitoring has both insufficient capacity and is not cost-effective, we're not going to consider it. What was implicit in that was that the new studies didn't add anything new to their prior reason for rejecting electronic monitoring, which is that electronic monitoring can't give you the breadth of data and can't make the judgments that's required in order to effectively monitor the bycatch, as far as keeping track of all the various species, et cetera. And, you know, it's not like the camera can do all that work. There would still need to be human beings interpreting what the camera found. So what did the studies, the new studies say that contradict those findings? Well, that's right, Your Honor. Two responses to that. First is that Oceana and other commenters weren't asking for electronic monitoring to replace onboard observers, simply to supplement onboard observers. And secondly, you're right that that is the explanation the agency gave, but that's the same explanation verbatim, copy and paste, that the agency gave in 2008, and the agency didn't consider any of these new studies to see that there was a lot of advancement, both in the capacity for electronic monitoring to record this data and in the cost between 2008 and 2015. The technology has improved greatly, and the agency simply never considered that because, as you noted, they relied on that explanation from 2008 to foreclose any further consideration. So, Your Honor, I see my time is up. If I can reserve some for rebuttal. Well, we'll see. Thank you. Thank you. Okay, we'll hear from the government. Good morning. Avi Kupfer for the Federal Appellees. With me at counsel's table is Gene Martin with the NOAA General Counsel's Office. Can I just ask you right up front, is there any – does the methodology impose any limitations at all on how much – on to which of the funding lines the agency allocates money for bycatch? So, Your Honor, let me take the question in parts. There are four funding lines that have to be used. They have to be used. That's – okay. That have to be used for executing this reporting methodology. Right. And that wasn't true under the prior case, correct? That's correct. Under the prior case, the agency could pick one, none, or ten, correct? Exactly. Now, under the methodology, it has to pick four. It has to use these specific four funding lines. These specific four for implementing this methodology. That's in the methodology. It's in the methodology. That's part of the – that's part of the 2015 amendment, which is the methodology. But – but – So, what was – what's your response to what counsel said, that that's not true, that you have – agency has complete discretion of it, still has total discretion over that? Is that – That's incorrect. The 2015 amendment removed any discretion for the agency in how this program is implemented. The problem identified – after the new methodology is how the agency allocates the appropriation to all of its funding lines, right? Once that occurs, the methodology takes over, it picks the four, and it determines what you do if there's a shortfall. Is that right? That's right. No matter the level of funding, there's a formula that applies that determines how these observers are allocated. Right. Could the agency allocate no funding to those four lines? Technically, the agency could, or Congress, could allocate no funding. No, but Congress has just given the agency a big block grant, right? Congress gives agency – traditionally, Congress has allocated a single line item to buy – So, with that single line, even though the methodology picks the four funding lines, could the agency still not fund any of those? Yes, that's – that hypothetical is conceivable. I'll note that – But that hasn't happened. No, not only has that not happened, but in the last three years, the agency has had all the funding it needs to send observers on the target number of trips. That's 11,000 to 15,000 trips a year in this region. But the government's position is that when the agency chooses whether to take the lump sum allocation and put it into those four funding lines or somewhere else, the agency has unfettered and, indeed, unreviewable discretion. Right. That's the lesson from Lincoln versus Vigil. The allocation of a lump sum appropriation isn't reviewable under the APA, but that doesn't impact the question of whether the reporting methodology is established or not established. Well, it suggests that you have not solved one of the two problems that we identified the last time around, which is that the trigger be defined, the trigger for creating the exceptions. Respectfully, Your Honor, I disagree with that. The problem identified by this Court in 2011 was that there was discretion to depart from the methodology on a case-by-case basis. If funding was insufficient, the agency could assign observers to trips ad hoc, at will. This methodology completely removed any discretion to assign observers. Sure. You've solved, no doubt, you've solved the second problem that we identified. Well, so our contention is that the cement kiln two-part test only comes into play if there is discretion to depart from the rule on a case-by-case basis. The problem with the 2008 amendment was that in cases where there was a funding shortfall, the agency had discretion to depart from the rule and assign observers at will. Does it establish a methodology if the agency has two different sets of rules? Clear rules, and then they say, but we reserve unfettered discretion to pick which set of rules we want to apply in any given year. The 2008 amendment did not. The 2008 amendment says if there's a problem. No, this is a hypothetical. I'm sorry. I'm not sure I followed. Agency is setting up the methodology, and they say, here's one set of rules that's going to be very intensive, lots and lots of inspections, and then they establish a second set of rules, which is the pared-back version of the inspections, and then they say we're reserving discretion to pick one or the other for any particular year. Does that establish a methodology? Because it seems to me that's this case. Yeah, our contention is that would establish a methodology. Here you have a single formula that's used to decide which trips observers are going to go on, and it accounts for all sorts of funding scenarios. The optimal funding scenario, which has occurred in recent years, and a suboptimal funding scenario when there's insufficient funding to send observers on a trip. When you choose not to spend money on this particular program. And regardless of the amount of money spent on this particular program, it wouldn't affect whether the reporting methodology is established or not established, is what the district court found, and that's our contention on appeal. Can I take you back to the four? I just want to be sure I understand this. When the agency gets its check for its appropriation, it allocates it to all of its funding lines. Now, this methodology picks the four that are two widgets to allocate money for bycatch research, right? In the greater Atlantic region, yeah. Sorry? In this greater Atlantic region, yes. Yeah, no, I understand that. Yeah, in the greater Atlantic region. So that did not exist in the 08 regulation. That's correct. Okay. Now, but the amount the agency puts into those four lines is still completely discretionary, correct? That's correct. And your position is that discretion comes from the case law, which says that agencies have discretion to allocate block appropriations, correct? Yes. But didn't our earlier decision say that that decision about how much to allocate to those four accounts had to be subject to a standardized methodology? So the way that I read this Court's 2011 opinion is that if there is discretion to depart from the rule, if there is discretion to assign observers ad hoc, you have to adequately define the trigger for that ad hoc discretion. In this methodology, there is no discretion to assign observers ad hoc. No matter the level of funding, the formula established in the 2015 amendment is how observers are assigned. Alternatively, we argue that even if this Court were to find that the two-part cement kiln test does apply and there is discretion to assign observers ad hoc, the trigger for that discretion is adequately defined. And as this Court said in cement kiln, the purpose of a trigger is to guide regulated parties and the agency on when that discretion will be used. The problem with the prior amendment is the regulated community didn't know the – when that trigger would occur. Here, they had the level of target observer coverage. They knew from past years what the cost of implementing it was. Our prior decision even required the agency to limit its discretion as to which of the four funding – to limit its discretion as to which of the funding lines got bycatch money, right? That's correct. You could have left that out. So your point is under – you read our decision as saying it applies only to the last decision the agency may be forced to make, which is what happens when there's a shortfall. It applies if there is discretion to depart from the rule, which there was in the 2008 amendment. In a funding shortfall, the agency said we reserved the right to assign observers ad hoc among the sufficient modes. They solved that problem in the 2015 amendment by taking away any discretion for how observers are assigned. No matter the level of funding, there is a formula written into the rule for how observers have to be assigned. They're automatically assigned to this formula, and they can't depart from that formula in any funding circumstance. So the problem at issue in Locke doesn't even arise in this case. The two-part cement kiln to test only arises if there is case-by-case discretion to depart from the rule, and that discretion was removed with the 2015 amendment. I'd like to turn quickly to the question of video cameras and whether the agency explained its reasoning for not including video cameras in the reporting methodology. Before you get to the explanation, I think the best argument on the other side is that the agency prejudged this when it said on the front end of the rulemaking on remand, which we're not even going to look at this, if this was addressed in 2008 on other issues other than the remand issue, we're not going to consider anything. Is that an unfair characterization? That is an unfair characterization, Your Honor. What OCEAN is referring to is a paragraph in a response to a comment about NEPA alternatives analysis. As you know, alternative is a term of art under NEPA, and what the agency was explaining was that- So it's in the Federal Register preamble? That's right. Sorry, could you just give me the JA page? Yes. It's at J- I can give you the Federal Register page. Okay, that's fine too. It's at 37185 to 37186 is the response to that comment. The comment was that OCEAN argues that the action does not contain a sufficient range of reasonable alternatives, including a net no action alternative under NEPA, and the agency did say that they hadn't reanalyzed any of the NEPA alternatives, but that was a completely separate question from whether the agency looked at developments in electronic technology and video cameras. Separate question, but if they said in that context across the board that any ground not within the scope of the remand order is deemed off the table, that would seem to apply to this video camera issue equally. So two responses. First, the agency was saying that they didn't conduct NEPA alternatives analysis, which would be analyzing alternative scenario-alternative reporting methodologies and the effects of those alternatives on the quality of the human environment. The agency, the 2015 amendment contained significant discussion of development in electronic monitoring and video camera technology responded to OCEANA's and others' comments about advances in that technology. Each of the studies cited by OCEANA was discussed in the amendment itself and in the preamble to the remand. In the preamble. Okay. Explaining why, for example, the Atlantic highly migratory species study did show some promise for electronic monitoring in the case of quota management for one-by-one looking at tuna as they come up. But this is a completely different scenario. You know, a lot of the types of monitoring here involves a trawl net just dumping hundreds of fish on a deck and as the agency explained, video cameras just aren't capable of doing the complex work that eye-catch observers do. I suppose the agency could have taken the position, which is the normal position when we find a defect in a regulation and remanded that the only thing open on remand is to fix that defect, right? That's what we normally do. Well, it doesn't remand because of a single defect in a regulation doesn't reopen the whole regulation. But I think their argument is that the agency on its own took another look at these issues. Well, Your Honor, this wasn't just a simple remand. The 2008 amendment was vacated.  That's true. That's a good point. That does allow them to bring that challenge. I would also note that the agency releases regular reports on the implementation of its 2013 electronic technologies policy and continues to monitor in ongoing developments and has modeled various scenarios of how it can incorporate video cameras into this reporting technology. Okay, great. Into the reporting methodology, rather. Anything else? No. Good. Thank you. Mr. Paterno, you were out of time, but you can have two minutes. Thank you, Your Honor. Briefly, Your Honor, in 2011, this Court held, this is at 1242 of the Oceana IV case, quote, because the agency determines both the amount of funding required for bycatch observation and the funding it will allocate for that purpose, it can determine the stringency of the supposedly external constraint and thus free itself at will from the methodology it purportedly established. This will not do. But that's because they could control both. That didn't mean that they have to eliminate discretion as to both. As to both, Your Honor? I'm not sure I understand. As to the amount of funding required in the funding that it will allocate for that purpose. Well, we submit here, Your Honor, that the agency continues to have discretion over both of those. The agency decides how much funding is required in the methodology and then also, as the government said, has total discretion over how much funding goes into these four funding lines that establish the supposed constraint. In response to your questions, Your Honors, the government conceded that the agency could allocate zero dollars to the four funding lines, in which case it would be an absolute departure from the methodology. But how is this new methodology, how does it, I mean, it cabins the discretion of the agency to determine the amount of funding that's needed because the methodology isn't dependent completely upon the amount of funds. The methodology sets forth these are how many observers are needed. And then if you don't have the funds to reach all of the 30% CV levels, then there are adjustments that are made, but it's not like it's all dependent upon the amount of funding in the first place. Well, whether the agency reaches that 30% CV for all the federally managed species is completely dependent, Your Honor, on the amount of funds the agency decides to allocate. And we would just point this Court to its 2011 decision, which we think forecloses the rule that the agency has promulgated here. Thank you. Thank you, Your Honor. Case is submitted.
judges: Tatel, Wilkins, Katsas